LIST & CLARK CONSTRUCTION COMPANY, PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT.

Docket No. 976–R.   Filed February 28, 1961.

*Albert F. Hillix, Esq., Charles E. Hoffhaus, Esq.,* and *William R. Morris, Esq.,* for the petitioner.

*Dennis C. Cronin, Esq.,* and *Harland F. Leathers, Esq.,* for the respondent.

TIETJENS, *Judge:* The Renegotiation Board determined that the petitioner realized excessive profits of $50,000 in the calendar year 1954 from contracts subject to the Renegotiation Act of 1951. The petitioner denies that any excessive profits were realized and challenges the Board's determination that the particular contract involved was not exempt from renegotiation. By amendment to the answer the Board asks a determination by the Court that the petitioner's excessive profits were not less than $150,000. The profits relate to a single contract carried out in 1952 and for which final payment was received in 1954. Some facts are stipulated.

### FINDINGS OF FACT.

The stipulated facts are incorporated by this reference.

The petitioner is a corporation organized under the laws of Missouri. Its principal office is in Kansas City, Missouri. It is engaged in the general contracting and earthmoving business.

On April 7, 1952, the petitioner entered into a contract with the Corps of Engineers, Department of the Army, designated as Contract No. DA–25–066–eng–1603, herein referred to as the contract. This contract was for the performance of Stage I earthwork at the Gavins Point Reservoir project on the Missouri River near Yankton, South Dakota. The contract was designated in petitioner's records as Job No. 363 and is sometimes referred to herein as the Gavins Point job.

In March 1952 the Corps of Engineers invited bids on the project for Earthwork, Stage I, for Gavins Point Reservoir Project in the form of sealed bids.

The petitioner was awarded the contract on the basis of a low bid in the amount of $860,163.20.

The contract recited that it was authorized by the Flood Control Act, approved 22 December 1944, Pub. L. 534, 78th Cong., 2d Sess. It provided, in part:

### CONTRACT FOR CONSTRUCTION

THIS CONTRACT, entered into this 7th day of April 1952, by the UNITED STATES OF AMERICA (hereinafter called the Government), represented by the Contracting Officer executing this contract, and LIST & CLARK CONSTRUCTION COMPANY, a corporation organized and existing under the laws of the State of Missouri of the City of Kansas City in the State of Missouri, hereinafter called the Contractor, witnesseth that the parties hereto do mutually agree as follows:

1. Statement of Work.—The Contractor shall furnish all plant, labor, materials and perform all work required for Earthwork, Stage I, for Gavins Point Reservoir Project near Yankton, South Dakota, for the consideration as listed in the following "Unit Price Schedule:"

## UNIT PRICE SCHEDULE

| Item No. | Description | Estimated Quantities | Unit | Unit Price |
|---|---|---|---|---|
| 1. | Clearing and Grubbing | | Lump Sum | $50,000.00 |
| 2. | Spillway Excavation | 458,000 | Cu. Yd. | .27 |
| 3. | Borrow Excavation | 593,000 | Cu. Yd. | .29 |
| 4. | Chalk Excavation, Powerhouse Area | 906,000 | Cu. Yd. | .37 |
| 5. | Stockpiled Boulders | 5,000 | Cu. Yd. | 1.50 |
| 6. | Compacted Fill, Impervious and Random | 747,000 | Cu. Yd. | .06 |
| 7. | Compacted Chalk Fill | 364,000 | Cu. Yd. | .10 |
| 8. | Uncompacted Chalk Fill | 664,500 | Cu. Yd. | .04 |
| 9. | Uncompacted Chute Fill | 199,300 | Cu. Yd. | .04 |
| 10. | Uncompacted Earth Fill in Work Area | 52,280 | Cu. Yd. | .04 |
| 11. | Chalk Bank Protection | 11,500 | Cu. Yd. | 2.50 |
| 12. | Additional Rolling | 600 | Roller Hr. | 12.50 |
| 13. | Water for Compaction | 8,850 | M. Gals. | 2.00 |

in strict accordance with the specifications, schedules, drawings, and conditions all of which are made a part hereof * * *

The specifications required completion of the contract within 210 days after receipt of notice to proceed, and provided for liquidated damages to the Government for each day of delay beyond such time or as extended.

The specifications described the site and the conditions found on subsurface investigation, stating that chalk was found in some borings and recited, in part:

(3) *Chalk.* The Niobrara chalk is found only on the abutments and generally assumes vertical exposures along the bluffs or in gullies. It consists of a horizontally bedded semimentary [*sic*] deposit of marine organisms. Its color is grey when freshly exposed and it weathers to a buff color. It is light in weight, varying from 80 to 115 pounds per cubic foot dry weight, is porous and relatively impervious. * * *

The specifications provided further, in part:

### SECTION I—CLEARING AND GRUBBING

*1-01. Scope.* The work covered by this section consists of furnishing all labor, equipment and materials and performing all work required to complete clearing and grubbing and disposal of cleared and grubbed materials as indicated on the drawings and specified herein.

\*     \*     \*     \*     \*     \*     \*

*1-04. Payment.* Payment will be made at the contract lump sum price for "Clearing and Grubbing," which price shall constitute full compensation for all costs of clearing and grubbing to the limits referred to in paragraph 1-02 and disposal of cleared and grubbed materials, all as specified herein.

\*     \*     \*     \*     \*     \*     \*

### SECTION II—EXCAVATION

*2-01. Scope.* The work covered by this section consists of furnishing all plant, labor, and materials and performing all operations required to complete the excavation indicated on the drawings and as herein specified. Excavation as

used in these specifications consists of the removal of earth, chalk and other materials from designated areas, and the transportation and disposal of such materials in areas designated herein or for construction of embankment as specified in Section III.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*2–05. Chalk Excavation.*

*a. General.* Chalk excavation shall consist of the removal of the material classified as chalk from the designated excavation area, to the lines and grades indicated on the drawing. The excavation shall be performed by approved methods that will not shatter, loosen or dislodge the material beyond the lines and grades of finished surfaces shown on the drawings.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*e. Disposal.* Chalk excavated from any location shall be disposed of in the upstream compacted blanket, the chute closure dike and otherwise in accordance with the details shown on the drawings and as otherwise specified in Section III.

The work required of the petitioner under the contract on the site of the main power facility at Gavins Point Reservoir consisted of clearing and grubbing, excavation and disposal of overburden, chalk, and borrow materials required for use elsewhere on the project, and stockpiling boulders. The excavation was principally rough or unfinished excavation, the finishing to be left for the succeeding contractor for Earthwork, Stage II. The petitioner constructed no buildings or other improvements, composed of materials other than earth, on the site of the main power facility.

The contract obligated funds appropriated for the civil functions of the Corps of Engineers, Department of the Army.

After the contract was awarded a flood of unusual severity occurred at the site of the project, hampering the petitioner in beginning its work and delaying the work for nearly 60 days.

The contract was modified by certain additions and change orders. The petitioner was directed to build a haul road to transport dirt for construction of a training dike to be built due to changes in the river resulting from the flood, at a unit price per yard, adding $175,790.78 to the price. A 30-day extension of time for completion was granted on account of this additional work. Other items were modified, some decreasing the price and others increasing it. Items based on unit prices per cubic yard of excavation were paid on the basis of actual cubic yards moved. The ultimate price was found to be $1,169,403.11.

The petitioner was delayed in commencing the work by the flood and also by the condition of the site following the flood. The river bottom was left with a considerable deposit of silt. The work area was wet and the petitioner had difficulty in moving its equipment into soft and wet ground and brush to reach the areas to be cleared and to excavate the required areas. It became necessary to use large

wooden mats to move the equipment. The chalk in its natural state, was found to be soft, wet, and unstable, and the contract was modified to place such chalk in the embankment and compact it. An additional lump-sum increase in price of $76,250 was authorized.

The petitioner found it necessary to work its men on the basis of a 10-hour day to meet its schedule. In July the crew was increased from some 60 to about 90 men. At the end of July a night shift began, also working 10 hours and the use of two shifts continued until the middle of November. A reduced day crew continued to finish the job and clean up afterward. The work was completed on schedule and in accordance with the revised specifications. On December 18, 1952, the Corps of Engineers accepted the work as having been completed on December 12.

The petitioner used certain equipment on the Gavins Point job. This included 6 shovels and draglines, 1 loader, 1 stubble plow, 27 Euclids, 13 tractors, 5 caterpillar graders, 3 rollers, 7 light plants, and 11 trucks.

The petitioner usually stored its equipment at the site of a completed job until it was wanted on another. The equipment ordinarily was not in use in the winter months. Most of the equipment used on the Gavins Point job was not used on any other job in 1952. A few of the items listed were used elsewhere prior to being moved to Gavins Point, but such prior use was insignificant. Practically all the equipment was used for double 10-hour shifts on the Gavins Point job. The petitioner found it necessary to engage operators for the equipment who had less than average experience in such work. On this job the petitioner's equipment was subjected to excessive wear and tear because of the abnormally wet working conditions, the use on double 10-hour shifts, the inability to provide proper maintenance, and the lack of experienced operators. The petitioner maintained a shop and engaged a number of mechanics. The equipment suffered such damage as broken drive lines and clutches and broken kingpins. The repair shop had more work than it could properly care for. The equipment was laid up for repairs more frequently than on normal work.

The petitioner received final payment on the contract in 1954 and it is the only contract of the petitioner purporting to be renegotiable for 1954.

The petitioner kept its books and prepared its income tax returns on the basis of accrued costs and completed contracts. The return for each calendar year showed profits and costs allocated to the contracts for which final payment was received in that year.

Under the petitioner's normal method of accounting all costs were charged to the contract on which they were incurred except deprecia-

tion, indirect expense, and general equipment repairs. These three items for each calendar year were allocated to individual contracts on the basis of the ratio of estimated billings or sales for a given contract to total billings, or sales, for all contracts on the records for that year.

The petitioner's books showed the following figures regarding its total income and the income from the Gavins Point job for 1954:

| | Gavins Point job (cents omitted) | Total of all jobs (cents omitted) |
|---|---|---|
| Net billings | $1,169,403 | $5,019,570 |
| Direct costs | 798,317 | 3,794,126 |
| Allocated costs | 134,630 | 623,171 |
| Depreciation on equipment | 78,803 | 348,997 |
| Indirect expense | 53,590 | 228,298 |
| General equipment repairs | 2,237 | 45,876 |
| Cost of sales | 932,947 | 4,417,297 |
| Gross profit | 236,456 | 602,273 |
| Other income (loss) | 2,428 | (15,578) |
| Book profit | 238,884 | 586,695 |

The petitioner's books showed the following figures for 1952:

| | Construction equipment (thousands of dollars) | Autos and trucks (thousands of dollars) |
|---|---|---|
| Cost | $1,718 | $209 |
| Reserve for depreciation 12-31-51 | 1,018 | 135 |
| Depreciation expense 1952 | 233 | 35 |
| | 1,252 | 169 |
| Less depreciation on assets sold | 0 | 6 |
| | 1,252 | 163 |

The balance sheet as of December 31, 1952, showed assets and liabilities:

| | (Thousands of dollars) |
|---|---|
| Current assets | $737 |
| Investments | 12 |
| Fixed assets: | |
| Construction equipment | $1,718 |
| Autos and trucks | 209 |
| | 1,927 |
| Less accum. depreciation | 1,414 |
| | 512 |
| Other fixed assets | 128 |
| Total assets | 1,390 |
| Liabilities | 628 |
| Stockholders equity | 762 |
| | 1,390 |

The petitioner's income tax return for 1952 showed:

|  | (Thousands of dollars) |
|---|---|
| Contract sales | $6,728 |
| Cost of sales | 6,705 |
| Gross profit | 24 |
| Other income | 61 |
| Total | 85 |
| Other expense | 16 |
| Net income | 69 |

|  | Total | Job 363 |
|---|---|---|
| Estimated sales | $3,804 | $985 |
| Depreciation | 278 | 66 |
| Indirect expense | 174 | 45 |

The major items of equipment used on the Gavins Point job were carried on the petitioner's books at a cost of $717,600.

The petitioner's books and records show the depreciation computed as to each of the major items of its equipment. The depreciation computed for 1952 upon the items used on the Gavins Point job amounted to $140,615. These figures do not include any additional amount on account of accelerated wear and tear due to the abnormal conditions experienced on this job.

The petitioner allocated on its books to the Gavins Point contract 25.89 percent, 2.33 percent, and 1.44 percent of its total depreciation and indirect expense charges for 1952, 1953, and 1954, respectively.

The petitioner, on December 31, 1954, wrote the District Engineer at Omaha, Corps of Engineers, United States Army, requesting exemption of this contract from renegotiation, referring to grounds described under section 106(a)(6) of the Act, and section 1453.5(b)(12) of the regulations of the Board. The request was forwarded to the Chief of Engineers in Washington with the following comments, among others describing the contract:

f. Principal features: (1) Clearing and grubbing, (2) Excavation and disposal of overburden, chalk and borrow material, (3) Stockpiling boulders, (4) Placement of embankment consisting of compacted and uncompacted earth fills and compacted and uncompacted chalk fills, (5) placement of protective dike in spillway area, (6) placement of fills in future downstream work area, and (7) Excavation and placement for haul roads, drainage and minor earthwork.

g. Estimated Amount: $860,163.20 based on estimated quantities at fixed unit prices and/or lump sum prices as shown on Abstract of Bids (Inclosure No. 2).

h. Method of Procurement: Award to low responsive bidder after formal advertising. Seven bids were received pursuant to Invitation for Bids issued on 5 March 1952. They were opened on 1 April 1952. The bids ranged from $860,163.20 to $1,389,816.40.

i. The Government Estimate of cost (without profit) was $733,539.12. The first and second low bids were 17.3 percent and 19.8 percent respectively, over

the Government Estimate, and were the only bids within the 25 percent award limitation. The other bids ranged from 25.7 percent to 89.5 percent over the Government Estimate.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

1. Work was completed and accepted as of 12 December 1952. Final payment has been made. Total earnings, based upon stated unit and/or lump sum prices, including additional work added by contract modifications, were $1,169,403.11 \* \* \*.

4. Contractor contends that the subject contract was so far removed from any direct and immediate connection with the national defense to be within the mandatory exemption. Contractor cites in support thereof (a) that the subject contract obligated funds appropriated for the civil functions of the Corps of Engineers, (b) that by far the greater amount of work done thereunder was at locations other than the site of the main power facility, and (c) that the relatively small amount of work which was done on the powerhouse site involved no construction but merely excavation of chalk overburden.

5. Attention is invited to Section 1453.5(b)(12) of the Regulations wherein the Board has determined that the Gavins Point Project is directly and immediately connected with defense because the project has as part of its purposes increase of power facilities for defense. However, this Section permits an exemption in those instances where the contract is for work or materials required for the construction or operation of navigation or flood control works, located elsewhere than on the site of the main power facility, as determined by the Corps of Engineers.

6. Earthwork, Stage I, included first stage excavation of the powerhouse area and first stage of construction of the dam embankment (compacted fill). It did not include any work in the spillway area.

7. It is the opinion of this office that this contract *was not* for work or materials required for the construction or operation of navigation or flood control works located elsewhere than on the site of the main power facility.

8. It is recommended that the request for exemption be denied.

The office of the Chief of Engineers recommended that in forwarding the case to the Renegotiation Board, it be accompanied with the recommendation that the request for exemption be denied.

The minutes of the Renegotiation Board show that on March 15, 1955, the Board denied the request of the petitioner for exemption of this prime contract, as modified.

The Board's order determining that the petitioner realized excessive profits of $50,000 in 1954 was mailed February 12, 1958.

The amount of $78,803 charged on the petitioner's books against the Gavins Point contract for depreciation on equipment was inadequate for the purpose of computing the profit on that contract.

A reasonable allowance for the depreciation actually sustained upon the petitioner's equipment used on the Gavins Point job in 1952 is at least $170,000.

The petitioner's profit on the Gavins Point job was not excessive.

The petitioner realized no excessive profits in 1954 from renegotiable contracts.

OPINION.

The petitioner raises an issue of jurisdiction contending that the Gavins Point contract was exempt from renegotiation and that the Board erred in refusing so to hold. The Renegotiation Act of 1951 exempts certain types of contracts from its provisions. Pertinent here are paragraphs (3) and (6) of section 106(a).[1]

The petitioner contends that this contract is exempt under section 106(a)(6) as a contract which does not have a direct and immediate connection with the national defense. The Board's regulations designating those classes and types of contracts exempt under that paragraph include contracts for the removal of "waste materials." Sec. 1453.5(b)(5).[2] The argument is that the material the petitioner was to remove from the powerhouse site was waste material which had to be removed and disposed of before other contractors could commence work on the foundations, and the contract expressly refers to such materials as brush, trees, stumps, roots, sod, overburden, and borrow materials not suitable for use in the embankment as "waste materials."

The petitioner also contends, as a further reason for exemption of this contract under section 106(a)(6) as not having a direct and immediate connection with the national defense, that it was exempt under provisions of the Board's regulations, section 1453.5(b)(12).[3]

[1] SEC. 106. EXEMPTIONS.
 (a) MANDATORY EXEMPTIONS.—The provisions of this title shall not apply to—
 * * * * * *
 (3) any contract or subcontract for the product of a mine, oil or gas well, or other mineral or natural deposit, or timber, which has not been processed, refined, or treated beyond the first form or state suitable for industrial use ; or
 * * * * * *
 (6) any contract which the Board determines does not have a direct and immediate connection with the national defense. The Board shall prescribe regulations designating those classes and types of contracts which shall be exempt under this paragraph ; and the Board shall, in accordance with regulations prescribed by it, exempt any individual contract not falling within any such class or type if it determines that such contract does not have a direct and immediate connection with the national defense. Notwithstanding section 108 of this title, regulations prescribed by the Board under this paragraph, and any determination of the Board that a contract is or is not exempt under this paragraph, shall not be reviewed or redetermined by the Tax Court or by any other court or agency ; * * *
 [2] 1453.5 Contracts that do not have a direct and immediate connection with the national defense.—* * *
 (b) *Exemptions.*—* * * the Board has determined that the following classes and types of prime contracts do not have a direct and immediate connection with the national defense :
 * * * * * * *
 (5) *Removal of waste materials.*—Contracts for the removal of waste materials.
 [3] 1453.5 Contracts that do not have a direct and immediate connection with the national defense.—* * *
 (b) *Exemptions.*—* * *
 (12) *Corps of Engineers.*—All contracts to the extent that they obligate funds appropriated for the civil functions of the Corps of Engineers, Department of the Army, * * * and were entered into after June 30, 1950, and * * * (ii) in the case of any project on list A, were for work or materials required for the construction or operation of navigation or flood control works, located elsewhere than on the site of the main power facility, as

These provide that certain listed contracts, including Gavins Point contracts, are so connected with the national defense except to the extent that they are for work or materials required for the construction or operation of navigation or flood control works located elsewhere than on the site of the main power facility. The petitioner argues that this contract related to the construction of navigation or flood control works located off the site of the main power facility.

The petitioner requested the Corps of Engineers to exempt this contract from renegotiation. The Chief of Engineers recommended denial of the request. It is shown that the Board had determined that the Gavins Point project was directly and immediately connected with national defense, with a stated exception which the District Engineer considered inapplicable to this contract. The Board denied the petitioner's request for exemption of the contract.

Paragraph (6) of section 106(a) exempts "any contract which the Board determines does not have a direct and immediate connection with the national defense," and further provides that "any determination of the Board that a contract is or is not exempt under this paragraph, shall not be reviewed or redetermined by the Tax Court or by any other court or agency." The petitioner objects that the Board's ruling does not expressly state that the contract "is not exempt under paragraph (6)" of section 106(a), and therefore is reviewable by this Court. It is evident, however, that the Board's denial related to the contention that the contract was not connected with national defense. To the extent the Board's action related to this point we are without authority to review it. The cases cited by the petitioner, *Vaughn Machinery Co.* v. *Renegotiation Board*, 30 T.C. 949, and *Golbert* v. *Renegotiation Board*, 28 T.C. 728, did not involve paragraph (6).

The petitioner also contends that the contract is exempt under paragraph (3) of subsection (a) of section 106. The prohibition against review of the Board's determination applies only to paragraph (6) and does not bar consideration of petitioner's argument under paragraph (3).

The petitioner's contention under paragraph (3) is that it was required by the contract to excavate a raw material described as "chalk" from the powerhouse excavation area and to place it in the dam embankment, in the chute closure dike and in other stated locations. The contract describes this chalk as a "horizontally bedded sedimentary

determined by the Corps of Engineers. The Board has determined that contracts related to the following projects on list A are directly and immediately connected with defense, except to the extent indicated above, for the reason that such projects have as part of their purposes the increase of power facilities for defense. * * *

LIST A

| Project | | | | | | River Basin |
|---|---|---|---|---|---|---|
| • | • | • | • | • | • | • |
| Gavins Point, Nebr. and S. Dak | | | | | | Missouri |

deposit of marine organisms," and notes that it is "relatively impervious." The petitioner says that it must therefore be of enhanced value for use in a dam embankment. The regulations adopted by the Board interpreting section 106(a)(3), exempting contracts for the product of a mine or other mineral or natural deposit, section 1453.2 (b)(3),[4] list certain raw materials as exempt, including limestone, seashells, and rough stone. "Chalk" is defined as "soft limestone * * * chiefly composed of the shells of Foraminifera." Hence, the petitioner argues, the mineral deposit which it was required to produce for use in the dam qualifies as limestone, seashells, or rough stone, the three items mentioned above on the raw materials exemption list, and the work done is exempt under the mandatory provisions of the Act and regulations.

We do not agree. The contract was not for the production of a natural deposit, or for chalk or stone, as such. The contract was for the excavation and removal of earth and other materials. It was merely incidental to the removal of materials that the contract specified that certain of them be placed in the dam and certain others be removed elsewhere. We do not interpret this arrangement as a contract for the "product" of a natural deposit, such as chalk or stone, which might be exempt under paragraph (3) of section 106(a).

On the merits, the petitioner contends that it had no excessive profits from the Gavins Point contract.

The petitioner reported on its tax return for 1954 sales of $5,019,570 and net income of $602,273, a profit of about 12 percent. The book figures on the renegotiable sales, that is, the Gavins Point job, showed sales of $1,169,403 or 23.3 percent of total sales, and profits of $236,456, or 20.2 percent of the renegotiable sales. If $50,000 of the profits on renegotiable sales are excessive, such sales amount to $1,119,403 and the profits are $186,456, or 16.6 percent of such sales. If $150,000 of these profits are excessive, the renegotiable sales amount to $1,019,-403, and profits to $86,456, or 8.5 percent of such sales.

The Corps of Engineers estimated the cost of the original contract at $733,539.12, without profit. The petitioner's bid of $860,163.20

---

[4] 1453.2 Contracts and subcontracts for certain agricultural commodities and raw materials.— * * *

(b) *Raw materials.* * * *

(3) *List of exempt raw materials.*—(i) The Board has determined that the following products are exempt under section 106(a)(3) of the act and subparagraph (2) of this paragraph when they represent products of a mine, oil or gas well, or other mineral or natural deposit, or timber, which have not been processed, refined or treated beyond the first form or state suitable for industrial use, * * *

*Raw Materials Exemption List*

* * * * * * *

Limestone, crushed limestone.

* * * * * * *

Seashells; oyster shells; clam and reef shells.

* * * * * * *

Stone, rough and dimension.

was the lowest bid and was accepted. This indicated a profit of 17.3 percent over cost or 14.7 percent of the contract price which must have been considered acceptable by the Corps of Engineers. Other bids involved a larger amount over the estimate. Various change orders and additions increased the amount ultimately payable to the total of $1,169,403.11. There were direct costs charged to this contract on the petitioner's books amounting to $798,317. These costs are not disputed. The petitioner allocated to this contract additional costs of $134,630, consisting of depreciation, $78,803; indirect expense, $53,590; and general equipment repairs, $2,237. Thus the book costs amount to $932,947.

The petitioner argues that its method of accounting regarding individual contracts by allocating depreciation and indirect costs on the basis of a percentage of billings did not accurately show the actual costs and profits under this contract. There were unusual circumstances involved in this contract and the real costs and depreciation on equipment were considerably in excess of the amounts shown on the books. Thus the book profits were unreal and the petitioner actually had very little profit or may have sustained a loss on the contract.

The petitioner charged its annual depreciation on equipment and indirect costs against its contracts on the basis of the percentage of billings. This method disregarded the identity of equipment used on any individual contract and the actual depreciation experienced by that equipment and also the proportion of executive time and administrative expense actually devoted to any such individual contract.

The Board contends that the petitioner's position is without merit. First, it is argued, costs are defined as deductions and exclusions under the Internal Revenue Code and most of the items claimed as additional costs do not qualify thereunder. Second, it is argued that costs must be determined in accordance with the method of accounting regularly employed by the contractor and the petitioner has not shown that its method here employed did not properly show its costs.

The Board contends further that the petitioner's profits on this contract were excessive in that the petitioner earned a profit of only about 7½ percent on sales for the period 1946 to 1949, inclusive, its return on net worth for 1946 to 1949 was 36.6 percent, and its profit in 1954 on nonrenegotiable sales was 9.5 percent, while its profit on renegotiable sales in 1954 was over 20 percent and its return on net worth, allocated on the basis of sales ratio, was 122 percent.

The depreciation charged on the books to this contract of $78,803 was allocated on the basis of the ratio of book depreciation to collections in the year of collection of the account, and represented a part of the depreciation charged on the books in each of the years 1952, 1953, and 1954 when payments on the contract were received. This was 25.89 percent of the total depreciation for 1952 and small

amounts in the subsequent years. This charge had no relation to the actual depreciation experienced in 1952 upon the equipment used on the Gavins Point job. For income tax purposes, the petitioner had no need to determine the costs of any individual contract. The petitioner's income over a period of years would be fairly and reasonably shown by measuring total receipts against total costs, and a separate computation of the profits or losses experienced upon any individual contract was not required. But in this proceeding the petitioner is faced with the problem of identifying the costs incurred in 1952 of carrying out this individual contract, isolated from others which had a part in producing the income reported for tax purposes.

The petitioner has shown that unusual and difficult conditions were encountered on this job which resulted in abnormal usage and wear of its equipment. After the contract was agreed upon a flood of exceptional severity occurred which delayed the start of the job for nearly 2 months. While an extension of time of 30 days was granted because of additional work required and possibly a further extension might have been allowed, this was of little help, for the urgent thing was to finish the job before winter set in and made completion impossible until the next spring. The flood left silt over the river bottom and left the land and brush wet, making it extremely difficult to move the machines. The petitioner first met these hazards by working its men 10 hours per day and soon found it necessary to work two 10-hour shifts per day. This continued for 114 consecutive days. The equipment was also worked on double 10-hour shifts. The extra use of this equipment left insufficient time for repairs and maintenance and tended to wear it more rapidly than was normal. After the job was completed a blizzard occurred and the petitioner could not do the usual cleanup and maintenance of the equipment to put it in condition for the next job.

Under these circumstances the petitioner's method of accounting did not properly reflect its costs of the contract.

The petitioner has identified the principal items of equipment used on this job and has shown the amount charged on the books for depreciation on this equipment in 1952. This summary gives a figure of $140,615. The Board objects that some of this machinery may have been used elsewhere in 1952 prior to this job. But the petitioner has shown that the season for its work in the area did not include the early months of the year and that most of the equipment had no prior use in 1952 and the remainder had no substantial use in that year on other jobs. The depreciation charge made on the books for this equipment was based upon the normal estimated life of this equipment. Under the circumstances of extraordinary wear the normal charge would not serve to reimburse the petitioner for the depreciation actually suffered.

The petitioner suggests that the depreciation actually suffered on its equipment in 1952 on this job should be computed by increasing the book charge for the specific items by some 75 percent. This percentage is derived by comparing the man hours put in by both shifts on the job with the man hours of the day shift computed upon an 8-hour-day basis. Most of the equipment was used in double shifts and undoubtedly suffered considerably more wear and damage than in the case of the normal 8-hours-per-day usage upon which the original depreciation estimate was based. While the Board objects that the records do not show the hours of work for each machine, the petitioner has shown the number of men on each shift and can compute the total man hours with sufficient accuracy for this purpose and the testimony shows that practically all the equipment was used in the night work as well as by day. We would not suppose that a modern earthmoving job crew would work without equipment.

The Board contends that a claim for accelerated depreciation on equipment must be supported by proof that the life of the equipment has been shortened by excessive use and that such proof is lacking here, citing *H. E. Harman Coal Corporation*, 16 T.C. 787 (1951), modified on other issues 200 F. 2d 415 (C.A. 4, 1952). The cited case deals with an income tax problem where the allowance of higher depreciation in one year would affect the allowance for a later year when the equipment became fully depreciated. Here the problem is different. We are finding the actual costs of an individual contract, not the income or deductions for a particular year. A reallocation of depreciation as between this contract and others for the sole purpose of measuring the profit on this contract would not change the income for tax purposes. In this case there was at least a double use of the equipment for a time and necessarily double wear and accelerated depreciation resulted.

We find it unnecessary to increase the depreciation to the extent suggested. It would surely not be unreasonable to add some 20 to 30 percent of the book depreciation as an allowance of additional costs of the petitioner on this account in 1952 due to the excessive hours of work and wear and tear on the equipment over and above the normal charge. If this is allowed, as we think it should be, the costs amount to more than $1,020,000 and the profit amounts to less than 15 percent of such costs or less than 13 percent of sales. Since the Government let the contract with an indicated potential profit of 17.3 percent over costs, the actual profit realized by the petitioner under the circumstances which subsequently developed was not excessive.

There were other additional costs which the petitioner suggests should be included in computing its actual profit on this contract such as an increase in the indirect expense based upon the larger

proportion of executive time devoted to this job than was charged to it on the books measured solely by ratio of sales. This computation would add some $13,000 to the costs and further reduce the percentage of profit on the job. Since we hold that the petitioner has shown its profits were not excessive in view of the actual depreciation suffered on equipment, we find it unnecessary to determine the amount of additional costs on this account.

*Decision will be entered for the petitioner.*