Gillmore M. PERRY

v.

The UNITED STATES.

No. 802–71.

United States Court of Claims.

Dec. 17, 1975.

**630**

Judith A. Yannello, Washington, D. C., for plaintiff; John T. Koehler, Washington, D. C., attorney of record; Hudson, Creyke, Koehler, Brown & Tacke, Washington, D. C., of counsel.

David R. Schlee, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, for defendant.

Before COWEN, Chief Judge, and KASHIWA and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

KASHIWA, Judge.

This renegotiation case comes before this court on a complete stipulation of facts. Plaintiff moved for summary judgment and defendant filed a cross motion for partial summary judgment in its favor and for a remand of this matter to the Trial Division for a trial de novo on the amount of excessive profits for the fiscal years 1965, 1966, and 1967. We deny plaintiff's motion for summary judgment and allow defendant's partial motion for summary judgment, for reasons hereafter stated.

The stipulated facts show that plaintiff is a manufacturer's representative and operates as a sole proprietor; his principal place of business is in Washington, D. C. Plaintiff represented manufacturers of household furniture, decorative floor and table lamps, and floor coverings for the purpose of securing Government business. Purchases of commercial items (these items are manufactured to contractor's own design and not pursuant to Government specification) of common use needed by the Government on a recurring basis (including the commodity classes sold by plaintiff) are handled by the Federal Supply Service of the General Services Administration through three basic buying techniques which are described in detail below.

1) *Store Stock Technique.* The first technique of procurement is the purchase on a definite-quantity basis, under formally advertised, competitively awarded contracts, of items to be stored at and issued from a G.S.A. warehouse. Items so procured are commonly referred to as "store stock" since, after purchase by G.S.A., an item is shipped by the manufacturer or supplier to one or more of the numerous G.S.A. supply distribution facilities (warehouses) located throughout the United States and is there held in inventory for later re-shipment by G.S.A. upon receipt of an order from a using agency. Store stock items are listed in an annually published G.S.A. Stock Catalog (hereinafter referred to as "Stock Catalog"). This catalog serves as the primary source of information on store stock items. The Stock Catalog includes representative items of each of the commodity classes sold by plaintiff; namely, household furniture, Class 7105; lamps, Class 6230; and floor coverings, Class 7220.

2) *Supply Schedule Technique.* The second technique of procurement is the purchase on an indefinite-quantity basis, under formally advertised, competitively awarded "requirements" contracts or (since 1968) under multiple-award, separately negotiated contracts, items used on a recurring basis by the Government which are to be shipped directly from the manufacturer to the ordering agency. In other words, G.S.A. enters into a procurement contract for these items on an indefinite-quantity basis and then an ordering agency places an order against such contract directly with the manufacturer. These items are more commonly referred to as "supply schedule" items. Information concerning supply schedule items is available through the publication and distribution of the Federal Supply Schedule. Each such schedule contains the names of the contractors, their

addresses, delivery and shipping information, maximum and minimum order limitations, price, and other essential ordering information. The Supply Schedules include representative items of each of the commodity classes sold by plaintiff; namely, household furniture, Class 7105; lamps, Class 6230; and floor coverings, Class 7220. In some cases items ordered from a Supply Schedule are not shipped directly to an ordering agency but are, instead, shipped to a G.S.A. warehouse for special packing. This occurs most frequently where an item is to be shipped overseas. In such cases the purchase order received by the manufacturer will show a G.S.A. warehouse as the shipping destination and the identity of the using agency or the ordering agency in coded information such as a Basic Procurement Identification Number as set forth in ASPR 20–203, or similar coded information for agencies not covered within ASPR.

3) *Consolidated Direct Delivery Technique.* The third method of purchasing that is used by G.S.A. is the purchase by G.S.A. of items on a definite-quantity basis under fixed-price, competitively awarded contracts for direct delivery from the manufacturer or supplier to a using agency or agencies. This method is commonly referred to as the "consolidated direct delivery" method. Basically, this approach involves purchases by G.S.A. that call for shipments directly from a manufacturer to a using agency or a group of using agencies. Purchases made for consolidated direct delivery may cover items available from either the supply schedule or the stock catalog and are normally made in one of two situations. First, an agency or group of agencies may desire to order a given item in a quantity which exceeds the maximum order limitation contained in a supply schedule. Second, a group of agencies may desire to combine their purchases of a given item in order to take advantage of the savings inherent in quantity purchases. (G.S.A., in fact,

encourages agencies to combine their requirements in this fashion.) G.S.A. itself may join with another agency or group of agencies in purchase through a consolidated direct delivery in order to restock its own warehouses. In such a case, G.S.A. will add the amount of the item it desires and this amount will be delivered directly to the particular G.S.A. warehouse involved. Finally, when an item is ordered on a consolidated direct delivery basis by several agencies, the original shipment of that item by the manufacturer is sometimes made to a convenient G.S.A. warehouse, where it is then broken down, marked, and reshipped to the various ordering agencies.

The items purchased by G.S.A. through the various procurement methods described above are commodities, commonly used by the civil agencies of the Government, that are readily available through the manufacturing and distribution channels of industry. At the same time, however, the G.S.A. Store and Supply Schedule System is also used by the various military departments to satisfy their needs for these same items. G.S.A., in other words, is the supplier of common use items to the Government at large. Utilization of the G.S.A. supply system by the various military departments is in accordance with the statutory authority of 10 U.S.C. § 2308 (1970) which provides that agencies and military departments may enter into interdepartmental purchasing agreements. The agreements between G.S.A. and the Department of Defense and military departments are implemented in Section V of the Armed Services Procurement Regulations. Essentially the commodity assignments are based on subject matter lines. The stipulation contains further details regarding preferred use of the various techniques, catalogues, changes in catalogue listing, dual listing, split listing, and other details.

Pursuant to Section 106(a)(6) of the Renegotiation Act of 1951,[1] the Board has issued detailed regulations setting

1. 50 U.S.C. App. § 1216(a)(6) (1971).

forth mandatory exemptions from renegotiation for those contracts not having a "direct and immediate connection with the national defense." 32 C.F.R. § 1453.5 (1974). In particular, the Board has granted such a mandatory exemption by regulation to certain contracts with G.S.A. 32 C.F.R. § 1453.5(b)(8) (1974).[2] This regulation first exempts all contracts of the Public Buildings Service and the National Archives and Records Service. It further exempts all Federal Supply Service "store stock" contracts. Finally, it exempts all FSS "supply schedule" and "consolidated direct delivery" contracts to the extent that deliveries thereunder are made to agencies *other than* the following:

1) Department of Defense
2) Department of the Army
3) Department of the Navy
4) Department of the Air Force
5) Atomic Energy Commission
6) National Aeronautics and Space Administration

Thus, FSS "supply schedule" and "consolidated direct delivery" contracts are subject to renegotiation to the extent that deliveries thereunder are made to the above-named agencies.

In issuing this regulation, the Board has in effect stated that, insofar as the sale of furniture or other items purchased by FSS is concerned, those contracts where it is known at the outset that the items will go to the listed defense agencies have a "direct and immediate connection with the national defense" within the meaning of the Act, while those contracts where it is not so known do not have a "direct and immediate connection with the national defense" within the meaning of the Act.

The plaintiff is a "manufacturer's representative" who is given a percentage commission by various manufacturers of furniture for each contract for the sale of furniture which he is able to procure for them with the United States. Insofar as the contracts which he procures for his clients are subject to renegotiation, the percentage commissions which he is given are also subject to renegotiation. 50 U.S.C. App. § 1213(g)(3)(A) (1970). The Board found that plaintiff had been given commissions on renegotiable contracts with FSS for the direct and immediate delivery of furniture to the defense-related agencies listed in 32 C.F.R. § 1453.5(b)(8) (1974). Plaintiff alleges in his petition that the Board found that plaintiff had earned excessive profits on these commissions for the years 1965 through 1967 in the following amounts:

| Year: | Net Renegotiable Profit | Excessive Profit |
|---|---|---|
| 1965 | $246,751.01 | $135,000.00 |
| 1966 | 233,854.62 | 145,000.00 |
| 1967 | 219,568.77 | 125,000.00 |

Plaintiff's renegotiable commissions were received with respect to two kinds of contracts. The bulk of the commissions was received for the procurement of FSS "supply schedule" contracts where deliveries of furniture were made directly and immediately from the manufacturer to one of the defense-related agencies listed in 32 C.F.R. § 1453.5(b)(8) (1974). The balance of the commissions was received for the procurement of "G.S.A. depot" contracts, which were in fact FSS "supply schedule" contracts, where deliveries were made from the manufacturer to a G.S.A. Supply Center for special packing and direct and immediate reshipment (usually overseas) to one of the defense-related agencies listed in 32 C.F.R. § 1453.5(b)(8) (1974).

■ Under each of the contracts which the Board determined to be renegotiable, plaintiff knew or should have known that the items were destined for one of the defense-related agencies listed in 32 C.F.R. § 1453.5(b)(8) (1974). Obviously he knew where the "supply schedule" items were destined because delivery of those items was made directly to the ordering agency. Similarly he knew,

---

**2.** This regulation was first issued on March 25, 1952, 17 Fed.Reg. 2519, and in all respects material to this case has remained the same ever since.

or should have known, also, where the "G.S.A. depot" items were destined because *at the very least* the Basic Procurement Identification Number of the ordering agency was set forth on the purchase order. ASPR 20–203 requires that this Basic Procurement Identification Number be placed upon each purchase order which is issued by a defense-related agency.

The Board's determination of excessive profits for the years 1965 through 1967 was rendered on August 4, 1971, and plaintiff's petition in this court seeking a de novo redetermination of its excessive profits for these years was filed on November 1, 1971.

The relevant portions of 50 U.S.C. App. § 1216(a)(6) (1971)[3] and 32 C.F.R. § 1453.5(b)(8) (1974)[4] are quoted in the margin.

■ The question presented is whether 32 C.F.R. § 1453.5(b)(8) (1974) and the Renegotiation Board's determination thereunder that a contract is or is not exempt may be reviewed or redetermined by the Court of Claims.

The Renegotiation Act of 1951 states that it shall not apply to contracts which "the Board determines" do not have "a direct and immediate connection with the national defense." 50 U.S.C. App. § 1216(a)(6) (1971). The Act further provides:

* * * regulations prescribed by the Board under this paragraph, and any determination of the Board that a contract is or is not exempt under this

---

**3.** 50 U.S.C. App. § 1216(a)(6) (1971) provides as follows:

"§ 1216. Exemptions.

"(a) Mandatory exemptions. The provisions of this title [sections 1211 to 1224 of this Appendix] shall not apply to

\* \* \* \* \* \*

"(6) any contract which the Board determines does not have a direct and immediate connection with the national defense. The Board shall prescribe regulations designating those classes and types of contracts which shall be exempt under this paragraph; and the Board shall, in accordance with regulations prescribed by it, exempt any individual contract not falling within any such class or type if it determines that such contract does not have a direct and immediate connection with the national defense. In designating those classes and types of contracts which shall be exempt and in exempting any individual contract under this paragraph, the Board shall consider as not having a direct or immediate connection with national defense any contract for the furnishing of materials or services to be used by the United States, a Department or agency thereof, in the manufacture and sale of synthetic rubbers to a private person or to private persons which are to be used for non-defense purposes. If the use by such private person or persons shall be partly for defense and partly for nondefense purposes, the Board shall consider as not having a direct or immediate connection with national defense that portion of the contract which is determined not to have been used for national defense purposes. The method used in making such determination shall be subject to approval by the Board. Notwithstanding section 108 of

this title [section 1218 of this Appendix], regulations prescribed by the Board under this paragraph, and any determination of the Board that a contract is or is not exempt under this paragraph shall not be reviewed or redetermined by the Court of Claims or by any other court or agency;"

**4.** 32 C.F.R. § 1453.5(b)(8) (1974) provides as follows:

"§ 1453.5. Contracts that do not have a direct and immediate connection with the national defense.

\* \* \* \* \* \*

"(b) *Exemptions.* Subject to the limitation provided in paragraph (c) of this section, the Board has determined that the following classes and types of prime contracts do not have a direct and immediate connection with the national defense:

\* \* \* \* \* \*

"(8) *General Services Administration.* All contracts of the Public Buildings Service and the National Archives and Records Service, General Services Administration; all contracts of the Federal Supply Service, General Services Administration, for store stock to be delivered to its Supply Centers; and all Federal Supply Schedule contracts and consolidated direct delivery contracts of the Federal Supply Service, General Services Administration, to the extent that deliveries thereunder are made to agencies of the Government other than the Department of Defense, Department of the Army, Department of the Navy, Department of the Air Force, Atomic Energy Commission, National Aeronautics and Space Administration and with respect to deliveries made before January 1, 1957, United States Coast Guard."

paragraph, shall not be reviewed or redetermined by the Court of Claims or by any other court or agency; * * ["Court of Claims" inserted in ·lieu of "Tax Court" by 1971 amendment.]

Although this statutory language of 50 U.S.C. App. § 1216(a)(6) (1971) has been repeatedly held under prior decisions hereafter mentioned to preclude any judicial review whatsoever of any Board regulations or determinations under the subject provision of the Act, plaintiff argues that we re-examine these cases.

In *Litton Industries v. Renegotiation Board,* 36 T.C. 431, 433 (1961), *aff'd,* 298 F.2d 156 (4th Cir. 1962), it was held:.

> Section 108 of the Renegotiation Act of 1951 gave the Tax Court such jurisdiction as it has to review determinations of the Renegotiation Board. Section 106(a)(6) expressly provides that, notwithstanding section 108, the Tax Court shall not have any jurisdiction to review or redetermine any determination of the Renegotiation Board that a contract is or is not exempt under subsection (a) of section 106 or to review or redetermine the regulations prescribed by the Board under section 106(a)(6). It seems clear that the Tax Court has no jurisdiction to take any of the actions sought by the petitioner in this case, and it must leave the parties as it found them. Cf. *Nathan Cohen v. Secretary of War,* 7 T.C. 1002.

In *List & Clark Construction Co. v. Renegotiation Board,* 35 T.C. 823, 832 (1961), the court stated:

> Paragraph (6) of section 106(a) exempts "any contract which the Board determines does not have a direct and immediate connection with the national defense," and further provides that "any determination of the Board that a contract is or is not exempt under this paragraph, shall not be reviewed or redetermined by the Tax Court or by any other court or agency." The petitioner objects that the Board's ruling does not expressly state that the contract "is not exempt under para-

graph (6)" of section 106(a), and therefore is reviewable by this Court. It is evident, however, that the Board's denial related to the contention that the contract was not connected with national defense. To the extent the Board's action related to this point we are without authority to review it. The cases cited by the petitioner, *Vaughn Machinery Co. v. Renegotiation Board,* 30 T.C. 949, and *Golbert v. Renegotiation Board,* 28 T.C. 728, did not involve paragraph (6).

In *Baltimore Contractors, Inc. v. Renegotiation Board,* 383 F.2d 690, 693–94 (4th Cir. 1967), the court stated:

> The Act was intended to reach only contracts having a direct and immediate relation to national defense. The Renegotiation Board was authorized to adopt regulations defining general exemptions and, under § 106(a)(6), to exempt individual contracts, having no such relation. There is no provision for a hearing, and the Board's decision is final and unreviewable.
>
> In *Litton Indus. of Md. v. Renegotiation Bd.,* 4 Cir., 298 F.2d 156, we held that this scheme did not amount to constitutional deprivation of a contractor who sought to have a contract treated as renegotiable. The theory was that the government is under no constitutional compulsion to provide any remedy for the enforcement of a right it has created against itself. * * * [Footnote omitted.]

It is our opinion that the view expressed by these three cases has been further supported by the very recent decision in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In that case a Federal district court took jurisdiction of a Social Security case under the general Federal question statute, 28 U.S.C. § 1331 (1970), in spite of a provision expressly prohibiting a section 1331 action. The Court held that such jurisdiction over suits seeking to recover Social Security benefits under section 1331 was barred by the strong, compel-

ling, prohibitive language in the statute. The Court held at 95 S.Ct. 2462:

> The third sentence of 42 U.S.C. § 405(h) provides:
>
> "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under [§§ 1331 *et seq.*] of Title 28 to recover on any claim arising under [Title II of the Social Security Act]."

> On its face, this provision bars district court federal question jurisdiction over suits, such as this one, which seek to recover Social Security benefits. Yet it was § 1331 jurisdiction which appellees successfully invoked in the District Court. That court considered this provision, but concluded that it was inapplicable because it amounted to no more than a codification of the doctrine of exhaustion of administrative remedies. The District Court's reading of § 405(h) was, we think, entirely too narrow.

> *That the third sentence of § 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that no action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted.* Moreover, if the third sentence is construed to be nothing more than a requirement of administrative exhaustion, it would be superfluous. This is because the first two sentences of § 405(h), which appear in the margin, assure that administrative exhaustion will be required. Specifically, they prevent review of decisions of the Secretary save as provided in the Act, which provision is made in § 405(g). The latter section prescribes typical requirements for review of matters before an administrative agency, including administrative exhaustion. Thus the District Court's treatment of the third sentence of § 405(h) ignored not only that sentence's plain language, but also relegated it to a function which is already performed by other statutory provisions. [Footnotes omitted.] [Emphasis supplied.]

We note that the statute in the present case prohibits in equal "sweeping and direct" language a review or redetermination by the Court of Claims. It is our opinion that the view expressed in *Litton Industries; List & Clark Construction Co.,* and *Baltimore Contractors, Inc.* is compelled by the direct language of the statute, and this is well supported by the Court in *Weinberger.*

We, therefore, hold that the Board's regulation drawing a distinction between "store stock" contracts on one hand and "supply schedule" and "consolidated direct delivery" contracts on the other may not be reviewed in this court. We also hold that the Board's determination that "supply schedule" and "G.S.A. depot" contracts procured by plaintiff wherein deliveries were made to the defense-related agencies listed in 32 C.F.R. § 1453.5(b)(8) (1974) had a "direct and immediate connection with the national defense" is also not reviewable in this court.[5]

---

5. We find an appropriate parallel in the statutory provision precluding judicial review of determinations of the Veterans Administration on claims for veterans benefits. 38 U.S.C. § 211(a) (1970). This statute provides that decisions of the Veterans Administrator regarding claims for benefits are final and conclusive and further provides that no court shall have the power or jurisdiction to review any such decision. This court held in *Brown v. United States,* 150 Ct.Cl. 836, 840 (1960), that such statutory language fully precludes any judicial review whatsoever of the decision of the Veterans Administrator denying a claim for veterans benefits. This court's rule in the *Brown* case has been repeatedly upheld by other federal courts. *De Rodulfa v. United States,* 149 U.S.App.D.C. 154, 461 F.2d 1240 (1972), *cert. denied,* 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220; *Fritz v. Veterans Administration,* 427 F.2d 154 (9th Cir. 1970); *Wickline v. Brooks,* 446 F.2d 1391 (4th Cir. 1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 749, 30 L.Ed.2d 750 (1972); *Redfield v. Driver,* 364 F.2d 812 (9th Cir. 1966); *Barefield v. Byrd,* 320 F.2d 455 (5th Cir. 1963), *cert. denied,* 376 U.S. 928, 84 S.Ct. 675, 11 L.Ed.2d 624 (1964).

Plaintiff relies heavily upon the fact that determinations of the Civil Service Commission under the Civil Service Retirement Act, 5 U.S.C. § 2266(c) (1964), are subject to a limited judicial review, even though the statute states that the determinations of disability shall be "final and conclusive and shall not be subject to review." *Gaines v. United States,* 158 Ct.Cl. 497 (1962), *cert. denied,* 371 U.S. 936, 83 S.Ct. 309, 9 L.Ed.2d 271 (1962); *McGlasson v. United States,* 397 F.2d 303, 184 Ct.Cl. 542 (1968). However, that statute speaks in terms which are not nearly as explicit as the one presently before the court. In *Gaines v. United States,* 158 Ct.Cl. 497, 502, *cert. denied,* 371 U.S. 936, 83 S.Ct. 309, 9 L.Ed.2d 271 (1962), this court stated:

> * * * At most, a court can set the Commission's determination aside (or refuse to recognize it as valid) only where there has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error "going to the heart of the administrative determination."

It was our view that a limited review may be allowed under the language in the Civil Service case. But here, in this case, the language used by Congress is much more compelling and prohibitive. The Board's regulations and determinations *"shall not be reviewed or redetermined by the Court of Claims or by any other court or agency."* 50 U.S.C. App. § 1216(a)(6) (1971). [Emphasis supplied.]

In these circumstances, the authorities cited by plaintiff that determinations of disability shall not be final and conclusive and subject to review are plainly inapposite.

■ There are various arguments submitted by plaintiff to show that unjust results will follow if plaintiff's commissions in this case are held to be subject to renegotiation. We do not agree. Plaintiff argues that the Board's determination under the regulations as to which contracts had a direct and immediate connection with the national defense is improper. However, under the "supply schedule" contracts, items were shipped directly from the manufacturer to a defense-related agency. Also, under the "G.S.A. depot" contracts even though the items went to G.S.A. Supply Centers for special packing, the manufacturer had the ability to know that the order was from a defense-related agency because the order set forth the Basic Procurement Identification Number. It is equally appropriate for the Board to conclude that "store stock" contracts do not have a direct and immediate connection with the national defense because of the uncertainty as to what using agency, defense or non-defense, will ultimately order the items delivered thereunder. Plaintiff also argues that the furniture, lamps, and floor coverings involved are not war materiel. Congress expressly intended that "[t]he words 'which do not have a direct and immediate connection with the national defense' *are not to be construed too narrowly."* 97 Cong.Rec.

In *Tracy v. Gleason,* 126 U.S.App.D.C. 415, 379 F.2d 469 (1967), it was held that 38 U.S.C. § 211(a) (1970) does not preclude review of an administrative decision on a matter not involving a "claim for benefits or payments." This decision did not, of course, hold that judicial review could be had of administrative determinations which were *within* the meaning of the statute. In other words, it only served to limit the number of decisions for which no judicial review could be had but left intact the rule that where there was an administrative determination on a claim for benefits or payments, that decision could not be reviewed. Further, in *DiSilvestro v. United States,* 405 F.2d 150, 155 (2d Cir. 1968), *cert. denied,* 396 U.S. 964,

90 S.Ct. 441, 24 L.Ed.2d 429 (1969), it was held that 38 U.S.C. § 211(a) (1970) does not preclude judicial review of the *Government's* claim for affirmative relief from a veteran for obtaining benefits fraudulently. Again, this does not disturb the basic rule that the administrative determination of eligibility for benefits is not reviewable. Finally, in *Johnson v. Robison,* 415 U.S. 361, 373, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), it was held that 38 U.S.C. § 211(a) (1970), does not preclude judicial review of the constitutionality of veterans benefits legislation. Again, this does not disturb the rule that decisions on claims for benefits made *under* the statute are not reviewable.

2254 (1951) (remarks of Senator George). [Emphasis supplied.] In fact, as Senator George stated, contracts for the construction of *houses* in the United States for *civilian* defense workers would be subject to renegotiation. Therefore, furniture, lamps, and floor coverings used by military personnel should also be renegotiable.

Defendant's motion for partial summary judgment is granted and we remand this case to the Trial Division for a trial de novo on the amount of excessive profits for the fiscal years involved. Plaintiff's motion for summary judgment is denied.